735 A.2d 688

COMMONWEALTH of Pennsylvania, Appellee,

v.

**Richard HACKETT, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 29, 1998.

Decided Aug. 9, 1999.

80

Norris E. Gelman, Philadelphia, for R. Hackett.

Catherine Marshall, Philadelphia, Robert A, Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NIGRO, Justice.

In this capital case, Appellant Richard Hackett appeals the order of the Court of Common Pleas of Philadelphia County, which denied his petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.* For the reasons discussed below, we affirm.

During the early morning of July 31, 1986, three men entered the basement of a home where they knew Gregory Ogrod and his girlfriend, Maureen Dunne, were sleeping. The three men attacked the sleeping couple by repeatedly stabbing and clubbing both of them. In the end, Dunne was stabbed to death, but Ogrod withstood the attack and managed to chase the assailants from the house.

The attack on Dunne and Ogrod was the culmination of a conspiracy to kill Ogrod headed by Appellant and Morris (Marvin) Spence. Spence's discontent with Ogrod stemmed from a soured drug-dealing relationship. Spence and Ogrod had been partners in dealing illegal drugs, but their relationship deteriorated after Spence stole money which Ogrod had given him to purchase drugs. When Ogrod demanded restitution, Spence refused. Appellant's dissatisfaction with Ogrod resulted from a contentious living arrangement. In the Spring of 1986, Appellant had moved into Ogrod's house at the invitation of Ogrod's brother. Ogrod objected to Appellant's presence at the house, which led to an ongoing dispute between Ogrod and Appellant.

On July 28, 1986, Spence and Appellant met with David Carter and attempted to enlist his help in killing Ogrod. During the meeting, Spence and Appellant offered Carter $5,000.00 to kill Ogrod and his girlfriend. After discussing a plan for the murders, Carter expressed his reluctance, complaining that he was being asked to kill two people for the price of one. Two days later, when Spence went to Carter's

house to finalize the plans for the attack, he met two of Carter's friends, James Gray and Keith Barrett. As the details of the plot were discussed, Carter renounced his decision to participate. Aware of Carter's refusal to partake in the conspiracy, Gray and Barrett offered to assist in the killings.

During the early morning of July 31, 1986, Appellant and Spence met with Gray and Barrett. Together, the foursome drove to Ogrod's house in Appellant's truck, and, after their arrival, Spence, Barrett and Gray entered the house. Once inside, Spence and Barrett went into the kitchen and armed themselves with knives; Gray carried a crowbar which he had found in Appellant's truck. The three of them went into the basement, where Ogrod and Dunne were sleeping, and attacked Ogrod and Dunne by stabbing and beating them. Following the attack, Spence, Gray and Barrett ran from the house to meet Appellant, who was waiting for them in his truck, and the four men drove off. Although Ogrod survived the assault, Dunne died.

On July 14, 1988, following a trial by jury, Appellant was convicted of murder of the first degree, aggravated assault, possession of an instrument of crime and criminal conspiracy. In the penalty phase, the Commonwealth moved the trial record into evidence and argued that two aggravating circumstances existed, namely, that Appellant had conspired to pay another person to kill the victim and that Appellant created a grave risk to another during the killing of the victim. *See* 42 Pa.C.S. § 9711(d)(2) & (7). After finding that both aggravating circumstances existed and that no mitigating circumstances were present, the jury returned a sentencing verdict of death. On April 26, 1990, the trial court denied post-trial motions and imposed the sentence of death for the murder conviction as well as terms of imprisonment for the remaining convictions. On appeal, this Court unanimously affirmed Appellant's judgment of sentence. *See Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719 (1993).

On January 14, 1997, Appellant filed a petition for relief under the PCRA. By order dated November 13, 1997, the

PCRA court denied Appellant's petition for relief. In his appeal to this Court, Appellant raises five claims, all of which allege that he was rendered ineffective assistance by his trial counsel.[1]

■ To establish a claim of ineffective assistance of counsel under the PCRA, a defendant must show that (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999).[2]

■ In his first claim, Appellant appears to argue that trial counsel was ineffective for failing to raise in post-trial motions and on direct appeal the issue that the trial court violated the requirements of *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), by improperly limiting the voir dire of the second panel of venirepersons. This claim fails.

■ It is well settled that the scope of voir dire rests within the sound discretion of the trial court. *Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1094 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999); *Commonwealth v. Marrero,* 546 Pa. 596, 606, 687 A.2d 1102, 1107 (1996). The purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court. *Karenbauer,* 715 A.2d at 1094; *Marrero,* 546 Pa. at 606, 687 A.2d at 1107.

Appellant, a white male, contends that he was charged with a crime that was interracial because he was accused of conspiring with three African American men to kill two white

1. Orders denying an individual post-conviction relief in a case in which the death penalty has been imposed are reviewable directly by this Court. 42 Pa.C.S. § 9546(d).

2. In *Kimball,* this Court held that the PCRA "does not create a higher burden on a defendant to show ineffective assistance of counsel than the standard for proving ineffectiveness on direct appeal." 724 A.2d at 332.

people. Appellant maintains that since the crime was interracial, he was entitled to have the venirepersons questioned about their racial biases. Relying on *Turner*, Appellant argues that the trial court impermissibly limited the inquiry concerning racial prejudices to the following question:

Now, ladies and gentlemen of the jury panel, you already heard from me that a young white girl died as a result of this incident alleged to have taken place, and a young white man was injured. You will note, quite obviously, that three out of the four defendants are members of the black race. I therefore pose this question to all of you. Is there any among you that have any feelings against all the defendants individually or collectively resulting, therefore, in a fixed opinion as to their guilt or innocence individually or collectively because of the race or color of any of the defendants? If so, please raise your hand.

N.T., 6/24/88, at 410.

In *Turner*, the defendant was an African American who had been convicted and sentenced to death for the murder of a white victim. On appeal, the defendant argued that the trial court had improperly denied his request to ask the venirepersons about racial prejudices during voir dire. The United States Supreme Court agreed and held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36–37, 106 S.Ct. at 1688.

Contrary to Appellant's contention, the trial court in the instant matter did not violate the dictates of *Turner*. Here, unlike *Turner*, the trial court informed the venirepersons of the race of the victim and did not refuse to question prospective jurors about racial prejudices. Rather, as noted above, the trial court specifically asked the second panel of venirepersons whether they had any fixed opinions as to Appellant's guilt or innocence because of the race of any of the defendants.

Appellant appears to contend, however, that by only asking this single question related to the issue of racial bias, the trial court impermissibly limited the scope of the voir dire. In *Commonwealth v. Richardson*, 504 Pa. 358, 473 A.2d 1361 (1984), this Court was presented with a similar claim. In *Richardson*, the defendant, an African American man, was charged with raping a white woman. At trial, the defendant requested that the trial court ask the venirepersons five specific questions during the voir dire, each of which was designed to uncover racial biases. The trial court refused, and instead, asked the prospective jurors the single question of whether the racial differences presented such a problem that it could interfere with their honest appraisal of the case and interfere with their ability to be completely fair to both the Commonwealth and the defendant. On appeal, the defendant claimed that the trial court erred by refusing to ask all five of the questions posed by him. This Court disagreed and held that "under the circumstances, where there are not factors present to infuse the case with an enhanced racial sensitivity, and racial differences were not a focus of evidence at trial, the one voir dire question posed by the trial court was sufficiently specific and probing to reveal prejudices which might have bearing upon the case." 504 Pa. at 364, 473 A.2d at 1364.

In the instant case, the record demonstrates that the issue of race was neither raised at trial nor emphasized by the prosecutor. In fact, as noted by the trial court in Appellant's direct appeal, the only relevant color in this case was "green," "the color of money," because the victim was killed as a result of a dispute over illegal drugs and the alleged mishandling of funds. Trial Ct. Op., 4/26/90, at 21. Given these circumstances, we find that the trial court did not abuse its discretion by limiting the inquiry concerning racial prejudices to the question of whether the prospective jurors had any feelings against the defendants as to their guilt or innocence based on their race. *See Richardson*, 504 Pa. at 364, 473 A.2d at 1364. Accordingly, Appellant's underlying claim that the trial court impermissibly limited the questioning of the second panel of venirepersons lacks merit and counsel cannot be deemed

ineffective for failing to raise it.[3] *See Commonwealth v. Rios,* 546 Pa. 271, 285, 684 A.2d 1025, 1031 (1996) (counsel cannot be considered ineffective for failing to raise claim that is without merit).[4]

In a related claim, Appellant contends that trial counsel was ineffective for failing to challenge in post-trial motions and on direct appeal the trial court's refusal to allow individual voir dire by counsel on the issue of racial prejudices. This claim fails.

This Court addressed a similar claim in *Commonwealth v. Craver,* 547 Pa. 17, 28–30, 688 A.2d 691, 697–98 (1997). In *Craver,* the defendant was convicted of murder and sentenced to death. On appeal, the defendant claimed that the trial court impermissibly limited his right to conduct individual voir dire since he was precluded from questioning the venirepersons, individually, about racial prejudices. In rejecting the defendant's claim, this Court noted that the method of voir dire challenged by the defendant was precisely the method of voir dire previously approved by this Court in *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986), and summarized the manner in which the voir dire was conducted as follows:

> The judge collectively asked the jury panel preliminary voir dire questions. Any juror who responded to any of those questions was examined further at sidebar regarding his response. After that preliminary voir dire, each prospective

---

3. Acknowledging that the trial court questioned the prospective jurors about fixed opinions based on race, Appellant proposes that the venirepersons should have been asked specifically about biases which may not have risen to the level of a fixed opinion. We have already determined that the question posed by the trial court sufficiently covered the issue of racial bias. Thus, the trial court was not required to further question the venirepersons on this issue. *See Richardson,* 504 Pa. at 364, 473 A.2d at 1364; *see also Karenbauer,* 715 A.2d at 1094 ("The scope of voir dire should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence.").

4. Appellant contends that even if the unconstitutional limitations imposed by the trial court on voir dire do not warrant a new trial, they do warrant a new sentencing hearing. However, since we have concluded that Appellant's claim is without merit, he is not entitled to any type of relief on the basis of this claim.

juror was taken separately into a hearing room where the trial judge, defense counsel and the prosecutor each had the opportunity to ask additional questions. This questioning dealt mainly with the prospective juror's ability to impose the death penalty, but each juror was questioned about other issues as well, particularly if the juror had responded affirmatively to one of the preliminary voir dire questions. 547 Pa. at 29, 688 A.2d at 697. The *Craver* Court held that this method of voir dire was sufficient to uncover racial prejudices and did not deny the defendant the right to conduct individual voir dire on the issue of racial prejudices.

The method of voir dire used by the trial court in the instant case was virtually identical to that used by the trial court in *Craver*. Here, as a preliminary matter, the court collectively questioned each of the three panels of prospective jurors. During this phase, the court asked whether anyone had any feelings against the defendants because of their race. N.T., 6/21/88, at 59; N.T., 6/24/88, at 410; N.T., 6/28/88, at 691–92. The court made a note of any affirmative responses so that the particular issue could be further explored during individual voir dire. Each venireperson was then taken separately into a hearing room where both the court and counsel had an opportunity to ask additional questions. Any individual who indicated that he had a racial bias or prejudice was dismissed. N.T., 6/24/88, at 420–21, 444.[5]

Under *Craver*, the trial court's method of voir dire in the instant case was sufficient to uncover any racial prejudices

---

**5.** For instance, prospective juror number 52 was asked during individual voir dire:

> Q: Now, when I spoke to the jury panel, sir, I asked a question with respect to any fixed opinion as to guilt or innocence because of the color of the defendants. Do you recall that question?
> A: Yes, I do.
> Q: Your response was that you had a fixed opinion; is that right?
> A: True.
> Q: Please note that I did not ask nor do I want you to tell me what that fixed opinion is. Do you still have such a view, fixed opinion?
> A: I believe I do.

N.T., 6/24/88, at 440, 443–44. The prospective juror was then dismissed for cause.

held by the venirepersons, and contrary to Appellant's contention, did not impermissibly deny Appellant his right to question the jurors individually about racial prejudices. As in *Craver*, the trial court collectively questioned the venirepersons about racial prejudices during the preliminary voir dire and, if a prospective juror indicated that he had a bias or prejudice during the preliminary voir dire, that juror was further questioned on that issue during individual voir dire. Thus, the trial court's method of voir dire was conducted in accordance with the law and was adequate to empanel a fair jury. *See Craver*, 547 Pa. at 28–30, 688 A.2d at 697–98. Accordingly, Appellant's underlying claim lacks arguable merit and counsel cannot be deemed ineffective for failing to raise it. *See Rios*, 546 Pa. at 285, 684 A.2d at 1031.[6]

█ In his third claim, Appellant contends that counsel was ineffective for failing to object and move for a mistrial on the ground that the Commonwealth exercised its peremptory strikes in violation of the United States Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson*, the Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to exclude jurors solely on account of their race. 476 U.S. at 89, 106 S.Ct. at 1719. Appellant maintains that the Commonwealth improperly exercised its peremptory

6. Appellant also appears to argue that since the trial court asked the venirepersons collectively, rather than individually, whether they had a fixed opinion based on the race of any of the defendants, the venirepersons may have been reluctant to honestly admit to being prejudiced. Thus, according to Appellant, he should have been allowed to repeat the inquiry regarding racial prejudices during each venireperson's individual voir dire. This claim fails. As noted above, this Court has held that the general method of voir dire employed by the trial court in the instant matter is sufficient to uncover racial prejudices held by the venirepersons and empanel a fair and impartial jury. *See Craver*, 547 Pa. at 30, 688 A.2d at 698. Moreover, Appellant cites no case law which would require the trial court, after collectively asking a panel of venirepersons about racial prejudices, to revisit the issue during individual voir dire with the venirepersons who had already answered the trial court's inquiry in the negative. In any event, the record shows that those potential jurors who did not respond affirmatively to the race question during the collective voir dire were excused for cause when their responses during the individual voir dire indicated prejudice or bias. *See, e.g.*, N.T., 6/27/88, at 543–545.

strikes to exclude African Americans from serving on the petit jury.[7]

In general, in order to establish a cognizable *Batson* claim on appeal, a defendant is required to make a record specifically identifying the race of all the venirepersons stricken by the prosecution, the race of the jurors acceptable to the prosecution who were stricken by the defense and the racial composition of the final jury selected. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 736 (1998); *Commonwealth v. Spence*, 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993). Here, Appellant has failed to make the requisite record, and therefore, has failed to preserve his claim for appellate review. *See Baez*, 720 A.2d at 736; *Spence*, 534 Pa. at 246–47, 627 A.2d at 1182–83.

Appellant contends, however, that he should be excused from the requirement of making a record since the trial court actually found that a prima facie case of improper use of peremptory strikes existed. In making this argument, Appellant relies on the following statement by the court:

> I make no further comment than what I'm going to say. [Co-defendant Spence's counsel] has already at least three times raised the question of *Batson*. **I am now advising everyone, I think both sides have been involved in *Batson* violations.** I will allow it but once more and I will not thereafter permit it. I will do what I feel I must do under the circumstances. I'm advising everyone so that no one gets the feeling that I'm going to surprise them. I strongly urge you to be just a little bit more considerate and view whether a person is qualified not by outside influences.

N.T., 6/23/88, at 317 (emphasis added).

▮ Appellant's reliance on this statement is misplaced. The record shows that after Appellant exercised a peremptory strike, the court excused the venireperson from serving on the

---

**7.** Relying on *Batson*, the United States Supreme Court has held that a white defendant can object on equal protection grounds to the exclusion of African American venirepersons by the prosecutor's use of peremptory challenges. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

jury. Although no one objected to the strike, the court, *sua sponte*, reminded all counsel that it would not permit strikes to be made on the basis of race. The court did not, as Appellant suggests, make a finding that a prima facie case of a *Batson* violation existed. Indeed, after making the statement, the court did not require that a race-neutral explanation be provided for the strike.[8] Given this context to the trial court's statement, Appellant cannot rely on such statement alone to establish the existence of a cognizable *Batson* claim. Since Appellant has failed to make the requisite record, his underlying claim lacks merit and counsel cannot be regarded as being ineffective for failing to raise a meritless claim. *See Rios*, 546 Pa. at 285, 684 A.2d at 1031.

In his fourth claim, Appellant contends that trial counsel was ineffective for failing to raise in timely objections, in post-trial motions and on direct appeal the issue that the trial court improperly limited the testimony of psychologist Albert Levitt during the penalty phase. Appellant contends that during the prosecutor's cross-examination of Levitt, the trial court impermissibly refused to allow Levitt to testify about the basis of his opinion.

During the penalty phase, Appellant presented the testimony of Albert Levitt, a licensed psychologist. Levitt testified that he had performed an extensive psychiatric interview and numerous psychological tests on Appellant. N.T., 7/15/88, at 1656–57. Levitt further testified that one of the tests that he administered was the "house-tree-person test." *Id.* at 1658. Levitt explained that this test requires an individual to draw a house, a tree, a person, a person of the opposite sex and a

8. Under *Batson*, once a defendant makes a prima facie showing that the prosecutor used its peremptory strikes to exclude potential jurors on account of their race, the prosecutor is required to provide a non-discriminatory reason for the strike. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 113–14 (1998); *Commonwealth v. Thomas*, 552 Pa. 621, 717 A.2d 468, 475 (1998). Although not mentioned by Appellant in his brief, we note that at one point during the voir dire, the trial court required the prosecutor to provide a race-neutral explanation for a strike. *See* N.T., 6/23/88, at 356–361. The prosecutor gave a race-neutral explanation, which the trial court accepted. Appellant does not in any way challenge the trial court's finding in this regard.

telephone pole. *Id.* Levitt testified that based on Appellant's drawing, it was his opinion that Appellant was emotionally disturbed and that Appellant had a maturity level equivalent to that of a child between the ages of eight and ten. *Id.* at 1664.

On cross-examination, the prosecutor sought to discredit the testimony of Levitt. During the prosecutor's questioning of Levitt, the following exchange took place:

Q. And that's the first time you ever saw him draw or anything of the sort, since it's the first time you talked to him; is that correct?

A. Yes, that's correct.

Q. And, now, this was the house he drew, and from that you've made the conclusions that you made?

A. Yes.

Q. It couldn't be that he was just a bad drawer?

A. No, sir.

Q. And do you mean to tell these ladies and gentlemen of the jury that in asking him to draw a tree, that because he put it on a hill, that indicates depression? One man draws one tree on a hill, and you're going to state an opinion that that means depression?

A. Yes, that's what I'm going to say. And that's what the literature——

Q. And you're going to tell these people——

A. And that's what the literature says.

COURT: Let him answer. You've asked the question, sir. Let him answer.

DISTRICT ATTORNEY: Yes, I will, Your Honor.

COURT: Go ahead, Mr. Levitt.

DISTRICT ATTORNEY: You're going to tell these people——

COURT: No. He hasn't answered the question yet.

WITNESS: There is a great body of literature on these drawings. There are many experts.

COURT: Sir, don't tell us about experts. You're being asked about what your conclusions are.

WITNESS: What I'm saying is there are people who do studies on these drawings.

COURT: Sir, you won't listen to me, will you?

WITNESS: I'm sorry.

COURT: You're being asked about your conclusion, not whether any experts——

COUNSEL: Objection. He's telling the Court what the basis of his opinion is.

COURT: Sir, your objection is noted and overruled. Sir, what you have are your conclusions. That's all I understand that the District Attorney is asking you.

WITNESS: That that indicates depression.

COURT: All right.

N.T., 7/15/88, at 1685–87.

Based on the above excerpt from the prosecutor's cross-examination of Levitt, Appellant contends that the court impermissibly refused to permit Levitt to testify about the basis of his opinion. Appellant further contends that by refusing to allow Levitt to testify about the basis of his opinion, the court limited the mitigating circumstances that the jury could consider.

In making this claim, Appellant has mischaracterized the record. The court did not preclude Levitt from offering evidence concerning the basis of his opinion. Rather, after Levitt attempted to provide an answer that was non-responsive to the question posed by the prosecutor, the court merely instructed Levitt to respond to the question that was being asked. Accordingly, Appellant's underlying claim that the court improperly limited Levitt's testimony is meritless and counsel will not be deemed ineffective for failing to present a meritless claim. *See Rios*, 546 Pa. at 285, 684 A.2d at 1031.

In his final claim, Appellant contends that trial counsel was ineffective for failing to object to the prosecutor's closing arguments during the penalty phase in which the prosecutor "urged the jury to make its decision in the same cruel and

malevolent manner exhibited by the killers." Appellant's Brief, at 47. In support of his claim, Appellant relies on the following portion of the prosecutor's closing arguments:

> Maureen Dunne on July thirty-first, 1986 was snug in her bed, when these guys came into the house and brutally, cowardly, attacked her. Think about that a moment. And think about when they've asked you to be merciful. Think of the mercy that was given to Maureen Dunne and Gregory Ogrod. But think about the bruises on Maureen's arms as she was crying out for mercy to stop this beating to her, as she was crying to stop it and it was continued. Think about that when you want to think about mercy and sympathy for these guys. You think about her last moments on earth, and you think about sympathy and mercy. Show them the same mercy they showed Maureen Dunne.

N.T., 7/16/88, at 1804–05.

It is well settled that a prosecutor's comments do not constitute reversible error unless their unavoidable effect would be to prejudice the jury and form in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination. *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 790 (1998); *Commonwealth v. Washington*, 549 Pa. 12, 40, 700 A.2d 400, 414 (1997). At the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is afforded even greater latitude in presenting argument. *Rompilla*, 721 A.2d at 790; *Washington*, 549 Pa. at 41, 700 A.2d at 414. The prosecutor may present argument "for or against the sentence of death" and may employ oratorical license and impassioned argument. 42 Pa.C.S. § 9711(a)(3); *Washington*, 549 Pa. at 41, 700 A.2d at 414.

Here, Appellant contends that the prosecutor improperly argued to the jury that it should show Appellant the same mercy that was shown to the victim. This Court, however, has consistently held that it is permissible for the prosecutor to ask the jury during the penalty phase to show the defendant the same mercy that he showed the victim. *See Rompilla*, 721 A.2d at 791 (prosecutor's comments in closing arguments of

penalty phase were permissible where prosecutor stated "I'm only asking you to show the same mercy to him that he showed to Jimmy Scanlon"); *Washington,* 549 Pa. at 43, 700 A.2d at 415–16 (prosecutor's comments in closing arguments of penalty phase were permissible where prosecutor asked jury "to give Anthony Washington the same sympathy and mercy that he showed to Tracey Lawson when he gunned him down in cold blood right between the eyes, right in the head"). Consequently, Appellant's underlying claim lacks arguable merit and therefore, counsel cannot be deemed ineffective for failing to raise it. *See Rios,* 546 Pa. at 285, 684 A.2d at 1031.

Based on the foregoing, we find that Appellant is not entitled to relief on the basis of any of his claims. Accordingly, the order of the Court of Common Pleas of Philadelphia is affirmed.[9]

Justice ZAPPALA concurs in the result.

---

9. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).