746 A.2d 592

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joseph Daniel MILLER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 12, 1999.

Decided Feb. 24, 2000.

Reargument Denied April 28, 2000.

Francis M. Socha for Joseph Daniel Miller.

Jeffrey B. Engle, Millersburg, for Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION OF THE COURT

CASTILLE, Justice.

In this appeal from the denial of appellant's petition filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. § 9541, et seq. ("PCRA"), appellant alleges various claims of trial court error, prosecutorial misconduct and ineffectiveness of counsel. For the reasons set forth below, we find that appellant is not entitled to relief and we affirm the ruling of the PCRA court.

Preliminarily, it is noted that on March 19, 1996, appellant was granted a stay of execution and was appointed new counsel for the purpose of filing his first PCRA petition. On June 3, 1996, appellant was granted an extension of time to file his first PCRA petition due to counsel's difficulty in obtaining certain records necessary for the filing of the petition. On November 19, 1996, as well as on December 13, 1996, appellant was again granted extensions of time to file his PCRA petition, and on February 24, 1997, the petition was filed. Since the petition under review is appellant's first petition and because appellant sought permission of the lower court to file a PCRA petition within one year of final judgment, the petition is timely.[1] 42 Pa.C.S. § 9545(b)(1).

---

1. This Court affirmed the judgment of sentence on direct review on August 25, 1995. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310 (1995). For purposes of the PCRA, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylva-

On direct appeal, this Court affirmed appellant's convictions and judgment of sentence. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310 (1995). We summarized the facts giving rise to appellant's convictions as follows:

[O]n August 6, 1992, appellant was arrested in connection with the rape of Clara Johnson, which had occurred the previous day. While in custody and after waiving his Miranda rights, appellant confessed to raping and murdering two other victims, Selina Franklin and Stephanie McDuffey, several years earlier. After confessing regarding the other two victims, appellant led police to where their bodies were buried. Appellant ultimately pleaded guilty to the 1992 charges of rape, kidnapping, aggravated assault and attempted homicide arising out of his 1992 attack on Clara Johnson. Evidence concerning that attack was admitted at appellant's trial for the kidnapping and murders of victims Franklin and McDuffey in order to establish a common scheme, plan or design.

The evidence regarding Clara Johnson, a six foot tall black woman, was that on August 5, 1992, while she waited for a cab at the Uptown Grill (a bar in Harrisburg), appellant and a friend of his offered her a ride. After the friend was dropped off, Johnson testified that she asked appellant to take her back to the bar because she had only consented to the ride when she believed that the friend would be present. Appellant pretended to agree to take her back to the Uptown Grill, but, after stopping at a mini-market for cigarettes and gasoline, he began driving in a direction away from the Uptown Grill, and in a direction away from Johnson's home. Johnson became nervous and, when she tried to get appellant to stop the car, a struggle ensued. Appellant told Johnson that he had something to do with her and that she "wasn't going anywhere." Appellant proceeded to drive at a high rate of speed to an isolated area near Conrail train tracks and, when Johnson tried to jump from the moving vehicle, appellant slammed on the brakes, causing

nia, or at the expiration of time for seeking the review. 42 Pa.C.S. § 9545(b)(3).

the car door to hit her in the head, dazing her. Appellant then attempted to run over Johnson with the car, but she fell down an embankment. Upon finding her approximately a half mile away from the car, appellant beat her in the head and face and raped her. After consuming a beer, he bound her with duct tape, and placed a knife to her throat. Appellant then informed Johnson that he was going to rape her again, after which he would have to kill her. He also told Johnson that all women were alike and that he had killed other women.

After raping Johnson again, appellant then repeatedly beat her about the head with beer bottles, and dragged her approximately half a mile by her legs to a ditch near where the car was parked, where he put duct tape over her mouth and nose. By happenstance, a Conrail security officer came upon the scene as appellant was dragging Johnson to the ditch. Upon seeing the Conrail officer, appellant fled on foot, leaving behind his car with a bloody knife stuck in the window well. Clara Johnson fortunately survived her ordeal and testified against appellant.

A registration check of the car left at the scene revealed that it belonged to appellant. Based on this information and on Johnson's statement, police went to appellant's home at 6:00 a.m. the next morning, August 6, 1992, to arrest him. Appellant fled to the roof of a multi-story apartment building, where he was apprehended after a six-hour standoff during which he had threatened to jump. Appellant was arrested and charged with the rape, aggravated assault, kidnapping and attempted murder of Clara Johnson. After being read and waiving his Miranda rights, appellant told Detective Thomas Brennan that Johnson had voluntarily accompanied him to the Conrail yard to have sex, and that a fight had ensued after an argument. At the end of the interview, Detective Brennan told appellant that he believed appellant had probably been involved in other assaults and that appellant could get in touch with him if he wished to provide further information or take him to any other bodies.

Five days later, on August 11, 1992, while in custody, appellant requested a meeting with Detective Brennan through a counselor at the Dauphin County Mental Health/Mental Retardation Program. Pursuant to appellant's request, Detective Brennan and appellant met at the prison between 4:00 and 5:00 p.m. After again waiving his Miranda rights, appellant further stated to Detective Brennan that he had killed a woman named Selina Franklin in 1987, and told Detective Brennan that he would take him to the body. Appellant also asked at the meeting to speak to a representative of the District Attorney's Office. Complying with appellant's request, Detective Brennan transported appellant to the District Attorney's Office at about 5:00 or 6:00 p.m. to meet with First Assistant District Attorney William Tully. En route to the District Attorney's Office, appellant told the detective that he had killed yet another woman in 1989, but that he did not recall her name.

At the District Attorney's Office, appellant told Mr. Tully, in Detective Brennan's presence, that he had committed several homicides and wanted the death penalty because he did not wish to further embarrass his family. Appellant further told Mr. Tully that the bodies were located at the Swatara Township landfill. While awaiting the assistance of other police departments to join in the search of the landfill, appellant gave Detective Brennan more details of the murders.

Specifically, appellant said in his statement that he had picked up Selina Franklin and her friends, and, after dropping off the other women at their homes, he took Franklin to the landfill where Franklin agreed to have sex with him for thirty-five dollars. He told Detective Brennan that after having sex with Franklin, he found an electrical insulator with which he beat Franklin over the head until she was dead. He then retrieved the thirty-five dollars from her pocket. Appellant said that several days after being questioned by police in connection with Franklin's disappearance, he had returned to the landfill, located the body and moved it to a different location, removed some of the

victim's clothing and scattered it around the landfill and buried the body along with the insulator. When he returned again several months later, he found bones sticking out of the ground, which he threw down a hill.

Appellant also told Detective Brennan about the killing of the other woman, whose name he did not know but who was later identified through testimony as Stephanie McDuffey. Appellant told the detective that sometime in 1989, he had picked up this second victim on the streets of Harrisburg and taken her to the same landfill where he had taken Franklin and that he and the second victim had sexual intercourse. He then took a piece of pipe from a junked car with which he beat her over the head until she was dead. Appellant told Detective Brennan that he then dragged her a short distance off the access road through the landfill and covered her body, along with the pipe, with lumber, shingles and tires.

Appellant also recounted the assault on Johnson which led to his arrest. Although appellant claimed that Johnson had accompanied him to the Conrail yard voluntarily and that they had had consensual sex, he also told Detective Brennan that sometimes he just got "the urge to go out, pick up a black female, rape her and kill her."

After his detailed statement to the first deputy D.A. and Detective Brennan, appellant was taken to the Swatara Township landfill between 6:00 and 7:00 that evening, where he pointed out the general location of the two bodies to police. Because police were not equipped to conduct a search at night, appellant agreed to return to the landfill the next morning to aid in the search for the bodies. On August 12, 1992, Detectives Brennan and Wenner secured appellant from the prison, advised him once again of his Miranda rights, which he waived, and took him to the landfill. During the drive, appellant marked two areas on an aerial photograph provided by the detectives as the general areas where the bodies were located. These corresponded to the areas he had indicated the previous night. En route to the landfill, appellant began to laugh for no

apparent reason and told Detective Brennan that he previously had been lying about the murders.

Notwithstanding Miller's recantation, police searched the areas indicated by appellant and, over the course of a week, found relatively intact human and fetal skeletal remains later identified as those of Stephanie McDuffey and her eight-and-a-half month old fetus. Her skull had been crushed, and the pathologist testified that the cause of death was several severe blows to the head. The position of the body indicated that it had been dragged to the location where it was discovered. The skeletal remains were identified by dental records and specific conditions of the pregnancy, as documented by hospital records. A pipe was also found alongside the body.

Police also uncovered the partial skeletal remains of Selina Franklin, including a foreleg bone around which a rope was knotted and tied. The pathologist testified that, based upon the tightness of the rope around the bone, prior to decay the rope would have been tightly tied around the victim's ankle. The skull was never recovered, so the body was identified by the clothing, which matched the clothing Selina Franklin wore when she was last seen by friends. An electrical insulator was found near the body.

*Miller*, 541 Pa. 531, 540–45, 664 A.2d 1310, 1314–17 (footnotes omitted).

To be eligible for relief under the PCRA, appellant must satisfy the following requirements:

(a) General rule. To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

. . . .

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the

truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

. . . .

(3) That the allegation of error has not been previously litigated or waived.

(4) That the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel.

42 Pa.C.S. § 9543(a)(2), (3) and (4).

Several of appellant's claims were previously litigated on direct appeal, and, therefore, are not eligible for review under the PCRA.[2] Appellant's remaining claims allege ineffective assistance of trial counsel and/or appellate counsel in order to bring these claims within the purview of the PCRA.[3] To succeed in these claims, appellant must demonstrate: (1) that the underlying claim is of arguable merit; (2) that counsel's performance had no reasonable basis; and (3) that counsel's ineffectiveness worked to his prejudice. *Commonwealth v. LaCava*, 542 Pa. 160, 178, 666 A.2d 221, 229 (1995)(citing *Commonwealth v. Edmiston*, 535 Pa. 210, 237, 634 A.2d 1078, 1092 (1993)). Because we find that none of

---

**2.** The claims that were litigated on direct appeal are appellant's claims that his trial counsel was ineffective for failing to present a diminished capacity defense (*Miller*, 541 Pa. at 557–59, 664 A.2d at 1323–24); that his statements to police were obtained in an unconstitutional manner (*Id.* at 555–57, 664 A.2d at 1322–23); that his conviction for kidnapping is not supported by the evidence (*Id.* at 546, 664 A.2d at 1317); that the trial court erred in admitting evidence that one victim was eight and one half months pregnant at the time of her death; (*Id.* at 551–52, 664 A.2d at 1320); and that the trial court improperly admitted evidence of appellant's prior bad acts during the sentencing phase (*Id.* at 547–51, 664 A.2d at 1318–20).

**3.** These ineffectiveness claims are properly layered because appellant argues that all of his prior counsel were ineffective for failing to assert the claims of trial court error. *Commonwealth v. Chmiel*, 536 Pa. 244, 251, 639 A.2d 9, 12 (1994).

appellant's claims here have any merit, his prior counsel were not ineffective for failing to object or present the claims on appeal.

Appellant first claims that trial counsel was ineffective for failing to investigate adequately and present evidence in support of the mental health mitigating circumstances: that, at the time of the offenses, appellant was under the influence of extreme mental or emotional disturbance [4] and that his capacity to conform his conduct to the requirements of law was substantially impaired [5]; and that prior counsel were ineffective for failing to raise this issue on appeal. Even though appellant's trial counsel presented medical testimony concerning appellant's mental state, the jury did not find either of those mitigating factors.[6] Specifically, appellant now argues that his trial counsel failed to investigate and present available

4. 42 Pa.C.S. § 9711(e)(2).

5. 42 Pa.C.S. § 9711(e)(3).

6. During the penalty phase of appellant's trial, the defense presented the testimony of two experts, neither of whom testified that appellant was under the influence of extreme mental or emotional disturbance or that his capacity to conform his conduct to the requirements of law was substantially impaired. Defense witness Dr. Robert Davis testified that appellant suffered from poly substance abuse, meaning that he abused marijuana, cocaine and alcohol, and that he suffered from an idiosyncratic reaction to alcohol in that he became violent when intoxicated. N.T. 3/25/93 at 137. Dr. Davis stated that appellant suffered from a character disorder with both immature and inadequate characteristics and functioned at the level of an adolescent or teenager despite the fact that he was 28 years old at the time of trial. *Id.* at 138. Further, Dr. Davis testified that appellant had attention deficit hyperactivity disorder. *Id.* Dr. Davis also stated that appellant had a lot of underlying anger related to childhood abuse. *Id.* at 142. On cross-examination, Dr. Davis conceded that alcohol ingestion was likely the main factor in the commission of the instant murders but that the only information he had regarding whether appellant was intoxicated at the time of the murders came from appellant. *Id.* at 144–46.

Defense witness Dr. Stanley Schneider testified that appellant was impulsive and hyperactive as a child, had learning disabilities, was mentally retarded, was physically and sexually abused and did not learn from his errors. *Id.* at 70. Further, Dr. Schneider stated that appellant had a diagnosis of minimum brain dysfunction that related to his learning disabilities and impulsiveness. *Id.* at 72. He also testified that appellant was capable of maintaining a normal, controlled lifestyle when he refrained from drinking alcohol. *Id.* at 73.

expert testimony regarding appellant's organic brain damage; that the prosecution failed to disclose material exculpatory evidence; and that he was not provided with adequate mental health experts in violation of his due process rights.

At the PCRA hearing, two defense experts and one prosecution expert all agreed that appellant had an organic brain disorder and that, therefore, the two psychological mitigating factors applied to him. The three mental health experts stated that the fact that appellant has organic brain damage was indicated in his prior medical records and that the penalty phase testimony of the two defense experts that there was only a suggestion that appellant's deficits were organic in nature was not accurate. Appellant's present expert neuropsychologist testified that appellant's mental health records, available at the time of trial, contained several "very strong flags" that should have led to neuropsychological testing, which would have revealed the organic brain damage from which he suffers.[7] N.T. 9/22/97 at 80. No neuropsychological testing of appellant was performed prior to his trial.

Appellant claims that his trial counsel was ineffective for failing to ask the two defense experts specific questions regarding whether appellant suffered from extreme mental or emotional distress at the time of the murders and whether his capacity to conform his conduct to the requirements of law was substantially impaired. Appellant's counsel had obtained all of the records pertaining to every institution that he knew of in which appellant had been housed and then turned them over to his experts for evaluation. *Id.* at 238–42. Both experts testified during the penalty phase to the many mental

7. Of particular note is a report of an electroencephalogram (EEG) performed while appellant was involuntarily committed to the Eastern State School and Hospital when he was fourteen years old. The report, which showed abnormal results, was not provided to appellant's trial experts. Appellant's psychiatric expert testified at the PCRA hearing that any qualified professional seeing the EEG report should have referred appellant for neuropsychological testing. N.T. 9/22/97 at 163. Appellant's trial counsel testified that he would have ordered neuropsychological testing if either of his experts had requested it and that he would have presented the EEG to the jury if he had known of its existence. *Id.* at 235–40.

and emotional deficits with which appellant is afflicted. In *Commonwealth v. Holland*, 556 Pa. 175, 183, 727 A.2d 563, 567 (1999), this Court held that defense counsel need not precisely reference the statutory language for the mitigating circumstances where the evidence presented would allow the jury to find the mitigating circumstances. Here, appellant's counsel presented all of the evidence available to him at the time of trial in support of the two mental health mitigators. Therefore, the claim that trial counsel was ineffective for failing to ask the experts the ultimate questions mirroring the statutory language is meritless.

Next, appellant argues that his trial counsel was ineffective for failing to find and produce to the experts the EEG report in question from Eastern State Hospital. There is no evidence that appellant's counsel ever received the EEG report in question from Eastern State Hospital despite his request for all documents in Eastern State's possession concerning appellant. Counsel obtained records from the institutions in which appellant had been housed and then placed them in a notebook. N.T. 9/22/97 at 238. He provided copies of that notebook to both of the defense experts who testified at trial. *Id.* at 241–42. The index of documents that appellant's trial counsel had in his possession at the time of trial does not include the EEG report. *Id.* at 242. Appellant's trial counsel in good faith requested records from Eastern State Hospital. If Eastern State failed to produce the EEG report, counsel cannot be deemed ineffective for failing to find the report and provide it to his experts because he had no way of knowing it existed.

Appellant next claims that he received inadequate expert mental health assistance in violation of his right to due process and to a reliable sentencing proceeding because the defense trial experts were not qualified to conduct neuropsychological testing. In *Commonwealth v. Christy*, 540 Pa. 192, 206, 656 A.2d 877, 883 (1995), relying on the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), this Court held that a

capital defendant is entitled to state-paid psychiatric assistance only where the assistance is needed to rebut the prosecution's argument of future dangerousness, not to prove mitigating circumstances. Here, future dangerousness was not an issue; therefore, appellant was not entitled to psychiatric assistance to prove the mental health mitigating circumstances. Nevertheless, appellant was provided with psychiatric assistance, and two expert mental health witnesses testified on his behalf during the penalty phase of his trial. Both witnesses provided testimony related to appellant's mental health status in support of the mental health mitigating circumstances. That the jury declined to find those mitigating circumstances does not mean that appellant's witnesses were inadequate. Therefore, this claim lacks merit.

■ Appellant's final claim related to the mental health mitigating circumstances is that the Commonwealth failed to disclose material, exculpatory evidence because it failed to produce the EEG report from Eastern State Hospital. Because Eastern State Hospital is state run, appellant argues that its failure to turn over the EEG report violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This claim fails because Eastern State Hospital's records were equally available to the prosecution and the defense. *Commonwealth v. Pursell*, 555 Pa. 233, 257, 724 A.2d 293, 305 (1999) (no *Brady* violation where the prosecution fails to turn over to the defense evidence that is readily obtainable by the defense). Thus, this claim is meritless.

Appellant's second claim is that his trial counsel was ineffective for failing to discover and present evidence of physical and sexual abuse suffered by appellant as a child. Appellant argues that his trial counsel should have discovered from family members that appellant was physically and sexually abused as a child and that physical and sexual abuse were pervasive in the household. Specifically, appellant asserts that trial counsel inadequately interviewed his niece, Karen Snavely, because he failed to learn from her that appellant had been sexually abused and that trial counsel completely failed

to interview Karen's mother, Mary Ann Snavely.[8] Appellant claims that these two individuals would have provided evidence of the atmosphere of rampant sexual abuse in his childhood home.

■ Mary Ann Snavely testified at the PCRA hearing about her own experience with sexual abuse by her stepfather, appellant's father, and that another brother in the household was repeatedly and severely physically abused. N.T. 9/22/97 at 196–203. She also stated that she moved from the family home when appellant was five years old. *Id.* at 204. Had her testimony been introduced at the penalty phase, it would not have shown that appellant himself suffered from abuse as a child because she did not testify that she observed any abuse of appellant and because she left home when he was very young. Thus, counsel was not ineffective for failing to present her as a mitigation witness.

■ Karen Snavely also testified at the PCRA hearing. She stated that various members of the family were sexually abused and that at some point she learned that appellant was sexually abused by his uncles. *Id.* at 188–89. She also testified that none of appellant's trial counsel asked her if appellant was sexually abused. *Id.* at 194. Appellant's trial counsel stated at the PCRA hearing that he met with appellant's family "over and over again," but the family was very uncooperative in terms of providing counsel with information that he could use in mitigation. *Id.* at 244–46, 249–50, 255–56. Further, appellant himself did not inform his counsel of the sexual abuse that occurred in the household. *Id.* at 251–52. Because appellant and his family failed to reveal the extent of abuse in the family home, counsel cannot be ineffective for failing to present evidence of the pervasive abuse at appellant's trial.

Next, appellant claims that trial counsel was ineffective for failing to object to several incidents of alleged prosecutorial

**8.** Mary Ann Snavely is appellant's half-sister. Appellant's father, Charles Miller, is the father of Mary Ann's daughter Karen, making Karen both appellant's half-sister and niece.

misconduct. Specifically, appellant claims that the prosecutor improperly injected victim impact considerations at both the guilt and penalty phases through his own comments and through the testimony of witnesses; that the prosecutor told the jury that they could not consider mercy; that the prosecutor commented on appellant's exercise of his constitutional rights; and that the prosecutor stressed the interracial nature of appellant's crimes.

Appellant first cites to the prosecutor's guilt phase opening address to the jury, which began with the following statement:

[I]n May of 1987, 18 year old Selina Franklin disappeared never to be seen again. Her family did what any family would do in similar circumstances. They searched. They worried. They hoped. They prayed.

\* \* \*

After five long years no one has been able to solve the riddle of what had become of Selina Franklin. Her family was left with emptiness, with no answers to some basic questions. What had happened to her. Had she run away? Was she the victim of foul play? No one knew.

\* \* \*

In November 1989 a 23 year old woman by the name of Stephanie McDuffey vanished. She was eight and a half months pregnant at the time of her disappearance.... So there was another family that had no answers, no explanations. Did she run away? Had she become a victim of foul play? No one knew. No one knew.

N.T. 3/22/93 at 12–14. Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict. *Commonwealth v. Hackett*, 558 Pa. 78, 91, 735 A.2d 688, 696 (1999). Here, the prosecutor merely stated that the families of the victims did not know what had happened to the victims and were understandably concerned. He did not belabor the

point. These fleeting references, which occurred in the first minutes of a three-day trial, were not victim impact evidence and could not have prejudiced the jury.

Appellant also claims that the testimony of the victims' mothers and one of their sisters was not offered for any probative reason but rather was offered only to remind the jury of the impact of the murders on the victims' families. The first of the witnesses, Louise Franklin, mother of victim Selina Franklin, testified very briefly about her daughter's age, where she lived, her height and weight and that she called the police a couple of days after her daughter was last seen. *Id.* at 35–38. Selina's sister, Rochelle Robinson, described, also very briefly, the last time she saw Selina and what Selina was wearing at the time. *Id.* at 39–41. Arvell McDuffey, mother of victim Stephanie McDuffey, testified, again quite briefly, about her daughter's age, physical description and the last time she saw Stephanie. *Id.* at 101–03.[9] All of this testimony was matter of fact and demonstrated that each victim was a life in being and was elicited for the purpose of placing the disappearances of the victims in the proper time frame and identifying them by clothing and appearance. Therefore, it was relevant and appropriate testimony.

9. Appellant claims in his brief that the prosecutor asked numerous questions about the victim's pregnancy. In reality, the prosecutor asked three questions that related to the pregnancy: one question that elicited the answer that she was pregnant, and two questions regarding her physical appearance due to the pregnancy. Further, this Court held on direct appeal that evidence of Stephanie McDuffey's pregnancy was relevant and admissible. *Miller*, 541 Pa. at 551–52, 664 A.2d at 1320. Generally, an appellant cannot obtain post-conviction review of claims that were previously litigated by alleging ineffectiveness of prior counsel and presenting new theories of relief to support a previously litigated claim. *See, e.g., Commonwealth v. Copenhefer*, 553 Pa. 285, 306, 719 A.2d 242, 253 (1998); *Commonwealth v. Whitney*, 550 Pa. 618, 629, 708 A.2d 471, 476 (1998). Here, appellant claims that the evidence which this Court previously found admissible along with comments made by the prosecutor and evidence from other victims' family members and the surviving victim was impermissible because it was introduced for the sole purpose of reminding the jury of the impact of the murders on the victims' families. Because this claim does not rest solely upon the previously litigated evidence, we will reach the merits of appellant's claim.

■ Appellant complains that the testimony of the one living victim was also prejudicial because she testified that she had four children and had graduated from a nursing program on the night of the crime.[10] These questions were asked in a matter of fact and brief manner. The testimony of the victim was background information and was therefore appropriate.

■ Appellant next claims that the prosecutor improperly questioned appellant at the penalty phase as to whether he had shown any remorse and that the prosecutor improperly asked appellant at the penalty phase whether he was aware that one of the victims had a child and whether appellant had apologized to the victims' families. There was nothing inappropriate in these questions, and they did not focus the jury's attention on the impact of the crimes on the victims' families. *See, e.g., Commonwealth v. Rollins,* 558 Pa. 532, 556, 738 A.2d 435, 449 (1999) (brief comments or questions by a prosecutor regarding a defendant's lack of remorse do not constitute misconduct).

■ Appellant next claims that the prosecutor improperly urged the jury to consider the impact of the murders on the victims' families. In his closing at the penalty phase, the prosecutor told the jury that when he concluded his argument, they would hear no more from the point of view of the victims or their families. N.T. 3/25/93 at 188. First, this isolated comment does not rise to the level of victim impact evidence. Second, at the penalty phase, the prosecutor is afforded more latitude and may employ oratorical license and impassioned argument. *Hackett,* 558 Pa. at 91–94, 735 A.2d at 696–97. The prosecutor's comments here did not go beyond permissible oratory.

■ Next, appellant contends that, during the penalty phase closing argument, the prosecutor improperly told the

**10.** On direct appeal, appellant challenged the admissibility of the surviving victim's testimony for the purpose of establishing a common scheme plan or design. This Court rejected that claim. *Miller,* 541 Pa. at 547–51, 664 A.2d at 1318–20. Again, because the claim involving this evidence involves other previously unchallenged evidence, the merits of the claim will be reached. See footnote 9.

jury that it could not consider mercy in arriving at a sentence. This claim is again belied by the record. The prosecutor stated in his closing that the jury would not be satisfied with the decision if it was based on "sympathy, compassion or mercy for either side." N.T. 3/25/93 at 184. Later, the prosecutor told the jurors that they "may consider that [appellant] showed no mercy to Selina Franklin. You will be asked to consider mercy on behalf of Joseph Miller. But you may consider that he showed no mercy to Selina." *Id.* at 186. The prosecutor also told the jury that they could consider that appellant showed no mercy to Stephanie McDuffey. *Id.* Contrary to appellant's argument, these statements by the prosecutor did not inform the jurors that they could not consider mercy. The prosecutor merely argued to the jury that they would be asked to consider mercy for appellant but that they could also consider the fact that appellant showed none for his victims. Because appellant's argument is not supported by the record, it fails.

■ Appellant next claims that the prosecutor made adverse comments about appellant's exercise of his Fifth Amendment rights and his right to assistance of counsel. Appellant argues that the prosecutor made an improper reference in his penalty phase opening statement to appellant's failure to testify at trial when he stated that appellant was the only source of information that the prosecution had regarding how the victims ended up in the landfill where their bodies were found. Further, appellant contends that the prosecutor's argument regarding the fact that appellant did not apologize to the victims' families until he was on the witness stand during the penalty phase was an improper comment on appellant's right to remain silent while capital charges were pending and while he had been advised by counsel to remain silent. Neither of these comments referred in any way to appellant's failure to testify or any invocation of his right to remain silent. Thus, this claim is meritless.

■ Finally, appellant argues that the prosecutor improperly questioned various witnesses about why appellant focused

on black women when he committed his crimes. Because appellant is white and the crimes were therefore interracial, appellant asserts that the prosecutor's questions regarding the race of the victims was inappropriate. Appellant cites not one authority, nor indeed have we found one, that stands for the proposition that a prosecutor may not question witnesses about why a defendant might target a certain race, gender or age group as his victims. Therefore, this claim, too, lacks merit.

Appellant next raises several claims relating to the aggravating circumstance of a significant history of felony convictions involving the use or threat of violence.[11] He argues first that this aggravator was unconstitutionally applied to him because the crimes involved non-violent burglary convictions and juvenile adjudications of delinquency and were misrepresented as convictions that had the potential for violence rather than as ones that involved actual violence. In *Commonwealth v. Baker*, 531 Pa. 541, 566, 614 A.2d 663, 676 (1992), we held that juvenile adjudications are admissible for purposes of sentencing, even in capital cases. We also found that burglary is a crime that involves the use or threat of violence. *Id.* at 568, 614 A.2d at 676. Because appellant makes the precise arguments we rejected in *Baker*, this claim fails.

In addition, appellant claims that the significant history aggravating circumstance is unconstitutionally vague. This Court has consistently rejected this argument and will not revisit that issue in this appeal. *See Commonwealth v. Williams*, 557 Pa. 207, 241, 732 A.2d 1167, 1185 (1999).

Next, appellant claims that the trial court's instruction regarding the nature and use of aggravating and mitigating circumstances was improper because the trial court stated: "They [aggravating and mitigating circumstances] are things that make a first degree murder case even more terrible or else less terrible." N.T. 3/25/93 at 217. This comment, appellant claims, misdirected the jury's attention to

---

11. 42 Pa.C.S. § 9711(d)(9).

the horrific nature of the evidence rather than the individual sentencing considerations pertinent to him. It is axiomatic that a jury charge must be read as a whole to determine whether it is fair or prejudicial and that the trial court has broad discretion in phrasing its instructions so long as the law is clearly, adequately and accurately presented to the jury. *Commonwealth v. Smith*, 548 Pa. 65, 78, 694 A.2d 1086, 1092 (1997). This Court will not review a charge by taking isolated comments out of context, which is what appellant would have us do here. The quoted statement was made approximately half way through a lengthy charge to the jury where the trial court clearly set out the aggravating and mitigating circumstances that the parties had attempted to prove, the differing burden of proof for the prosecution and the defense and the required sentence if the jury made certain findings. This isolated comment did not distract from the trial court's charge which clearly, adequately and accurately presented the law to the jury. Thus, this claim fails.

 Appellant's next claim is that the verdict form, when combined with the jury charge, prevented the jury from considering mitigation evidence put forth by appellant because it was not specifically listed on the form or enumerated in the jury charge. As stated previously, the trial court's charge to the jury, when read as a whole, was proper. The verdict form provided to the jury was identical to the form mandated by Pa.R.Crim.P. 358A. Therefore, the verdict form was appropriate, and this claim is meritless.

 Appellant's last substantive claim is that the proportionality review conducted by this Court on direct appeal failed to provide meaningful appellate review.[12] Specifically,

**12.** Like all of appellant's claims in this PCRA appeal, appellant raises this issue in the context of an ineffectiveness of counsel claim. Because our proportionality review took place at the time of his direct appeal, this post-conviction proceeding is appellant's first opportunity to challenge our proportionality review in state court. Arguably, the appropriate avenue for relief on this claim, if any were to be had, would be a petition for writ of certiorari to the United States Supreme Court arising out of our decision on direct appeal, which that Court denied on

appellant complains that his due process rights were violated because he was not provided with notice of the nature of the review to be conducted nor an opportunity to be heard regarding the review. This Court provided to appellant the proportionality review required by 42 Pa.C.S. § 9711(h)(3)(iii), a review process that we upheld as constitutional in *Commonwealth v. Gribble*, 550 Pa. 62, 92, 703 A.2d 426, 441 (1997). Appellant, like all capital defendants, was provided with notice of this Court's proportionality review by statute and by existing case law at the time of his direct appeal. An opportunity to be heard on the issue existed at the time of appellant's direct appeal, and we have afforded him an additional opportunity in this appeal. Thus, appellant's due process rights were not violated, and this claim lacks merit.

Appellants final claim is that the cumulative effect of the errors claimed warrants a new trial. Because we have found that all of appellant's claims are either previously litigated or lacking in merit, it follows that the cumulative effect of those claims would not entitle appellant to relief. Accordingly, the verdict and sentence of death are affirmed.[13]

Justice SAYLOR files a concurring opinion.

SAYLOR, Justice, concurring.

I join the majority opinion, but write to clarify my views concerning the entitlement of an indigent capital defendant to expert psychiatric assistance. The majority, in dicta, reaffirms this Court's interpretation in *Commonwealth v. Christy* that, pursuant to the United States Supreme Court's decision in *Ake v. Oklahoma*, government-funded assistance is mandated only in circumstances where it is required to rebut the Commonwealth's argument of future dangerousness. While *Ake* has been interpreted in a similar manner by some other courts, other jurisdictions have found that the federal constitu-

February 20, 1996. Nonetheless, we will address the merits of the claim.

13. The Prothonotary is hereby directed to transmit to the Governor's Office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court of Pennsylvania pursuant to 42 Pa.C.S. § 9711(i).

tional due process principles at issue in *Ake* support the conferral of assistance in a broader array of circumstances. *See, e.g., Starr v. Lockhart,* 23 F.3d 1280, 1287 (8th Cir.1994), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994); *Clisby v. Jones,* 960 F.2d 925, 928–29 (11th Cir.1992).

Nevertheless, and regardless of the constitutional dimension to the inquiry, this Court has found that the decision whether to appoint an expert is further subject to appellate review for an abuse of discretion, and that the nature of the case as a capital one is a significant factor in this review. *See, e.g., Commonwealth v. Carter,* 537 Pa. 233, 257, 643 A.2d 61, 73 (1994), *cert. denied,* 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). In those cases where a legitimate component of the defense to the charge of murder or the Commonwealth's effort to obtain a sentence of death lies in demonstrating to the jury a claim concerning the defendant's mental condition, expert psychiatric assistance may be indispensable. In such instances, I believe that it would be an abuse of discretion for the trial court to deny a request for funding, even though the request would not implicate federal constitutional due process concerns as interpreted by *Christy.* I would thus enforce as mandatory what the majority posits is permissive so that, as the trial court appropriately ensured in the present case, an indigent defendant is provided core resources necessary to present a full and fair defense in all phases of capital litigation.