Commonwealth v. Miller

C.P. of Dauphin County, nos. 2775, 2775-A, 2787 and 2787-A CD 1992.

*James Barker,* for Commonwealth.
*Robert Brett Dunham, Matthew C. Lawry, Anne Saunders* and *Shawn Nolan,* for defendant.

TURGEON, *J.,* June 30, 2003—Currently before the court is the Commonwealth's appeal from this court's December 17, 2002 order, which vacated two death sentences imposed upon petitioner Joseph Miller and imposed consecutive life sentences upon him, on the basis that petitioner is mentally retarded and as such, cannot be executed under *Atkins v. Virginia,* 536 U.S. 304 (2002). This opinion is written in support of that order, pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL BACKGROUND

On March 24, 1993, petitioner was convicted by a jury for the first-degree murder and kidnapping of Selina Franklin and the first-degree murder of Stephanie McDuffey. Following a capital sentencing hearing, the jury returned two death sentences. After petitioner's post-trial motions were denied, he was formally sentenced to consecutive death sentences and a consecutive seven and a half to 15 years for kidnapping. *Commonwealth v. Miller,* 113 Dauph. 374 (1993). Petitioner filed a direct appeal from the death sentences, which were affirmed by the Pennsylvania Supreme Court. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310 (1995).

On December 13, 1995, a warrant of execution was signed by then-Governor Ridge. On January 5, 1996, the Pennsylvania Supreme Court granted a stay of execution. On February 20, 1996, the United States Supreme Court denied petitioner's petition for writ of certiorari. *Miller v. Pennsylvania,* 516 U.S. 1122 (1995). On March 11, 1996, Governor Ridge signed a second warrant of execution scheduling petitioner for lethal injection on March 26, 1996. On March 19, 1996, this court granted a petition for stay of execution and appointed counsel to allow petitioner to pursue collateral relief under the Post Conviction Relief Act. On December 2, 1997, this court denied petitioner's request for PCRA relief and state habeas corpus relief. *Commonwealth v. Miller,* 118 Dauph. 16 (1997). Petitioner's appeal to the Supreme Court was denied February 24, 2000. *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592 (2000).

On August 19, 2002, petitioner filed a petition seeking PCRA and habeas corpus relief, under *Atkins v. Vir-*

*ginia,* 536 U.S. 304 (2002). The United States Supreme Court held in *Atkins* that the execution of persons who suffer from mental retardation constitutes cruel and unusual punishment in violation of the Eighth Amendment. After the Commonwealth filed an answer to the petition, both parties filed extensive documentary evidence from previous proceedings in this case which established that petitioner suffers from mental retardation. Accordingly, on December 17, 2002, based upon the documentary evidence, I issued an order vacating both death sentences and imposing consecutive life sentences upon petitioner. The Commonwealth has timely appealed from that order.

## FACTUAL BACKGROUND

The Supreme Court previously summarized the facts giving rise to petitioner's convictions, as follows:

"[O]n August 6, 1992, appellant was arrested in connection with the rape of Clara Johnson, which had occurred the previous day. While in custody and after waiving his *Miranda* rights, appellant confessed to raping and murdering two other victims, Selina Franklin and Stephanie McDuffey, several years earlier. After confessing regarding the other two victims, appellant led police to where their bodies were buried. Appellant ultimately pleaded guilty to the 1992 charges of rape, kidnapping, aggravated assault and attempted homicide arising out of his 1992 attack on Clara Johnson. Evidence concerning that attack was admitted at appellant's trial for the kidnapping and murders of victims Franklin and McDuffey in order to establish a common scheme, plan or design.

"The evidence regarding Clara Johnson, a six-foot-tall black woman, was that on August 5, 1992, while she

waited for a cab at the Uptown Grill (a bar in Harrisburg), appellant and a friend of his offered her a ride. After the friend was dropped off, Johnson testified that she asked appellant to take her back to the bar because she had only consented to the ride when she believed that the friend would be present. Appellant pretended to agree to take her back to the Uptown Grill, but, after stopping at a mini-market for cigarettes and gasoline, he began driving in a direction away from the Uptown Grill, and in a direction away from Johnson's home. Johnson became nervous and, when she tried to get appellant to stop the car, a struggle ensued. Appellant told Johnson that he had something to do with her and that she 'wasn't going anywhere.' Appellant proceeded to drive at a high rate of speed to an isolated area near Conrail train tracks and, when Johnson tried to jump from the moving vehicle, appellant slammed on the brakes, causing the car door to hit her in the head, dazing her. Appellant then attempted to run over Johnson with the car, but she fell down an embankment. Upon finding her approximately a half mile away from the car, appellant beat her in the head and face and raped her. After consuming a beer, he bound her with duct tape, and placed a knife to her throat. Appellant then informed Johnson that he was going to rape her again, after which he would have to kill her. He also told Johnson that all women were alike and that he had killed other women.

"After raping Johnson again, appellant then repeatedly beat her about the head with beer bottles, and dragged her approximately half a mile by her legs to a ditch near where the car was parked, where he put duct tape over her mouth and nose. By happenstance, a Conrail

security officer came upon the scene as appellant was dragging Johnson to the ditch. Upon seeing the Conrail officer, appellant fled on foot, leaving behind his car with a bloody knife stuck in the window well. Clara Johnson fortunately survived her ordeal and testified against appellant.

"A registration check of the car left at the scene revealed that it belonged to appellant. Based on this information and on Johnson's statement, police went to appellant's home at 6 a.m. the next morning, August 6, 1992, to arrest him. Appellant fled to the roof of a multistory apartment building, where he was apprehended after a six-hour standoff during which he had threatened to jump. Appellant was arrested and charged with the rape, aggravated assault, kidnapping and attempted murder of Clara Johnson. After being read and waiving his *Miranda* rights, appellant told Detective Thomas Brennan that Johnson had voluntarily accompanied him to the Conrail yard to have sex, and that a fight had ensued after an argument. At the end of the interview, Detective Brennan told appellant that he believed appellant had probably been involved in other assaults and that appellant could get in touch with him if he wished to provide further information or take him to any other bodies.

"Five days later, on August 11, 1992, while in custody, appellant requested a meeting with Detective Brennan through a counselor at the Dauphin County Mental Health/Mental Retardation Program. Pursuant to appellant's request, Detective Brennan and appellant met at the prison between 4 and 5 p.m. After again waiving his *Miranda* rights, appellant further stated to Detective Brennan that he had killed a woman named Selina

Franklin in 1987, and told Detective Brennan that he would take him to the body. Appellant also asked at the meeting to speak to a representative of the district attorney's office. Complying with appellant's request, Detective Brennan transported appellant to the district attorney's office at about 5 or 6 p.m. to meet with First Assistant District Attorney William Tully. En route to the district attorney's office, appellant told the detective that he had killed yet another woman in 1989, but that he did not recall her name.

"At the district attorney's office, appellant told Mr. Tully, in Detective Brennan's presence, that he had committed several homicides and wanted the death penalty because he did not wish to further embarrass his family. Appellant further told Mr. Tully that the bodies were located at the Swatara Township landfill. While awaiting the assistance of other police departments to join in the search of the landfill, appellant gave Detective Brennan more details of the murders.

"Specifically, appellant said in his statement that he had picked up Selina Franklin and her friends, and, after dropping off the other women at their homes, he took Franklin to the landfill where Franklin agreed to have sex with him for 35 dollars. He told Detective Brennan that after having sex with Franklin, he found an electrical insulator with which he beat Franklin over the head until she was dead. He then retrieved the 35 dollars from her pocket. Appellant said that several days after being questioned by police in connection with Franklin's disappearance, he had returned to the landfill, located the body and moved it to a different location, removed some of the victim's clothing and scattered it around the land-

fill and buried the body along with the insulator. When he returned again several months later, he found bones sticking out of the ground, which he threw down a hill.

"Appellant also told Detective Brennan about the killing of the other woman, whose name he did not know but who was later identified through testimony as Stephanie McDuffey. Appellant told the detective that sometime in 1989, he had picked up this second victim on the streets of Harrisburg and taken her to the same landfill where he had taken Franklin and that he and the second victim had sexual intercourse. He then took a piece of pipe from a junked car with which he beat her over the head until she was dead. Appellant told Detective Brennan that he then dragged her a short distance off the access road through the landfill and covered her body, along with the pipe, with lumber, shingles and tires.

"Appellant also recounted the assault on Johnson which led to his arrest. Although appellant claimed that Johnson had accompanied him to the Conrail yard voluntarily and that they had had consensual sex, he also told Detective Brennan that sometimes he just got 'the urge to go out, pick up a black female, rape her and kill her.' . . .

"After his detailed statement to the first deputy D.A. and Detective Brennan, appellant was taken to the Swatara Township landfill between 6 and 7 that evening, where he pointed out the general location of the two bodies to police. Because police were not equipped to conduct a search at night, appellant agreed to return to the landfill the next morning to aid in the search for the bodies. On August 12, 1992, Detectives Brennan and Wenner secured appellant from the prison, advised him once again of his *Miranda* rights, which he waived, and took him to

the landfill. During the drive, appellant marked two areas on an aerial photograph provided by the detectives as the general areas where the bodies were located. These corresponded to the areas he had indicated the previous night. En route to the landfill, appellant began to laugh for no apparent reason and told Detective Brennan that he previously had been lying about the murders.

"Notwithstanding Miller's recantation, police searched the areas indicated by appellant and, over the course of a week, found relatively intact human and fetal skeletal remains later identified as those of Stephanie McDuffey and her eight-and-a-half month old fetus. Her skull had been crushed, and the pathologist testified that the cause of death was several severe blows to the head. The position of the body indicated that it had been dragged to the location where it was discovered. The skeletal remains were identified by dental records and specific conditions of the pregnancy, as documented by hospital records. A pipe was also found alongside the body.

"Police also uncovered the partial skeletal remains of Selina Franklin, including a foreleg bone around which a rope was knotted and tied. The pathologist testified that, based upon the tightness of the rope around the bone, prior to decay the rope would have been tightly tied around the victim's ankle. The skull was never recovered, so the body was identified by the clothing, which matched the clothing Selina Franklin wore when she was last seen by friends. An electrical insulator was found near the body." *Miller,* 541 Pa. at 540-45, 664 A.2d at 1314-17. (footnotes omitted)

Petitioner pled guilty to all charges involving Clara Johnson on March 9, 1993. On March 24, 1993, follow-

ing a jury trial, petitioner was found guilty of the first-degree murder and kidnapping of Franklin and the first-degree murder of McDuffey. In the penalty phase of the trial, the jury was presented with evidence of the statutory aggravating factors and mitigating circumstances relevant to a capital case. The jury found, for each murder, that the Commonwealth had proven beyond a reasonable doubt the existence of two aggravating factors.[1] The jury also listed the following mitigating circumstances as having been found by one or more of them by a preponderance of the evidence: childhood abuse, low mental intelligence, neglect by family and society, mental illness, alcohol problems, and psychological trauma caused by neglect.[2] Ultimately, the jury concluded the

---

1. The two aggravating factors in the Franklin murder were that petitioner committed the killing while in the perpetration of a felony (kidnapping) and that petitioner had a significant history of felony convictions involving the use or threat of violence to the person. 42 Pa.C.S. §9711(d)(6) and (d)(9). In the McDuffey murder, the jury also found that petitioner had a significant history of felony convictions involving the use or threat of violence to the person and that petitioner had been convicted of another offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (*i.e.* the murder of Franklin). 42 Pa.C.S. §9711 (d)(9) and (d)(11).

2. The jury had been presented with the following mitigating circumstances to consider: (1) petitioner was under the influence of extreme mental or emotional disturbance; (2) the capacity of the petitioner to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; (3) petitioner's age at the time of the crimes; and (4) other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense including mental intelligence, mental illness, learning disabilities, childhood problems and alleged abuse and cooperation. 42 Pa.C.S. §9711(e)(2), (3), (4) and (8).

aggravating factors outweighed the mitigating circumstances and returned death sentences for both murders.

## LEGAL DISCUSSION

In death penalty cases, the court may grant PCRA relief without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the petitioner is entitled to relief as a matter of law. Pa.R.Crim.P. 907(2). The record provided the court, from earlier proceedings in this case, established that there existed no genuine issues of material fact as to petitioner's mental retardation which was established by petitioner to this court on proof by a preponderance of the evidence. As such, petitioner was entitled to relief under *Atkins* as a matter of law.

In *Atkins* the United States Supreme Court held that the Eighth Amendment's ban on excessive cruel and unusual punishment prohibits the execution of individuals with mental retardation, reversing *Penry v. Lynaugh,* 492 U.S. 302 (1989). The court acknowledged that a consensus had developed amongst state legislatures that had addressed the matter and that those states had unanimously created law finding death not a suitable punishment for a mentally retarded criminal. The court reasoned that it was not persuaded that the execution of mentally retarded criminals would measurably advance the deterrent or the retributive purpose of the death penalty. As such, "in construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' such punishment is excessive and that the constitution 'places a substantive restriction on the state's power to take the life' of a mentally retarded offender." *Atkins* at

321 (citing *Ford v. Wainwright*, 477 U.S. 399, 405 (1986) (holding that it is a violation of the Eighth Amendment to execute the insane)).

We note that, in determining how to proceed with petitioner's mental retardation claim, the court in *Atkins* held that it would "leave to the states the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences," as it had done in *Ford v. Wainwright. Id.* at 317. Thus, the court left to each state, decisions on procedure, including whether a judge or jury should adjudicate a mental retardation claim, who maintains the burden of proof, what burden of proof should be required and to a lesser extent, the definition of mental retardation. At the time I vacated petitioner's death sentences, neither the Pennsylvania Supreme Court nor the General Assembly had conclusively addressed these issues.[3] As such I based my decision assuming petitioner maintained the burden to prove his mental retardation by a preponderance of the evidence and that the court, and not a jury, was the proper

---

3. Currently, there exist separate pending bills addressing *Atkins* before both the state senate and house. The bills propose amendments to portions of the Post Conviction Relief Act and Sentencing Code, including setting forth the procedure for raising mental retardation in a capital case, assigning the burden and the level of proof, and defining mental retardation. S.B. no. 26, 2003-2004 sess. (2003); H.B. no. 1073, 2003-2004 sess. (2003). Both bills provide that, in the context of raising the issue in a PCRA, that the petitioner prove mental retardation by a preponderance of the evidence. They provide slightly different variations of the meaning of mental retardation and the Senate version requires that the judge determine mental retardation while the House requires a jury to determine that issue. See footnote 9. On June 17, 2003, S.B. 26 passed the Senate 48-1. The House version emerged from committee June 17, 2003.

body to evaluate a claim of mental retardation, as is the case with competency hearings. Furthermore, the consensus clinical definition of mental retardation used by the vast majority of professionals in the field, acknowledged in *Atkins,* was the appropriate definition.[4]

In so concluding, I find analogous the law as applied in Pennsylvania competency proceedings, which closely resemble the issues before us, and in which, the defendant maintains the burden of proving incompetency to the court by a preponderance of the evidence.[5] As noted, in prohibiting states from executing the mentally retarded, the *Atkins* court relied upon its 1986 decision in *Ford v. Wainwright,* where it had similarly found execution of the insane violative of the Eighth Amendment. Thereafter, in *Medina v. California,* the United States Supreme Court approved a California statute requiring that the

---

4. The United States Supreme Court has noted that:

"[M]ental retardation is easier to diagnose than is mental illness. That general proposition should cause little surprise, for mental retardation is a developmental disability that becomes apparent before adulthood. . . . By the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years." *Heller v. Doe,* 509 U.S. 312, 321-22 (1993) (citing, inter alia, DSM-III and AAMR definitions, discussed *infra*).

5. Pennsylvania Mental Health Procedures Act, 50 P.S. §§7101-7503, provides as follows:

"Section 7403. Hearing and determination of incompetency to proceed; stay of proceedings; dismissal of charges

"(a) Competency determination and burden of proof.—Except for an incompetency examination ordered by the court on its own motion as provided for in section 402(d), the individual making an application to the court for an order directing an incompetency examination shall have the burden of establishing incompetency to proceed by a preponderance of the evidence. The determination shall be made by the court." 50 P.S. §7403.

defendant prove incompetency by a preponderance of the evidence. 505 U.S. 437 (1992). However, in *Cooper v. Oklahoma,* the United States Supreme Court found unconstitutional an Oklahoma rule which required that a capital defendant prove his incompetence by clear and convincing evidence. 517 U.S. 348 (1996). The rule was constitutionally infirm because it allowed the state to try a defendant who was more likely than not incompetent, which it found violative of the due process clause. *Id.* at 368. The Pennsylvania Supreme Court subsequently applied *Cooper* and *Medina* in *Commonwealth v. duPont,* holding that Pennsylvania's competency statute, which required that the defendant prove incompetency to the court by a preponderance of the evidence, was constitutionally valid under the due process clause of the Fourteenth Amendment. 545 Pa. 564, 568, 681 A.2d 1328, 1329-30 (1996). Our state Supreme Court similarly held that this standard of proof did not offend due process under Article I, Section 9 of the Pennsylvania Constitution. *Id.* at 568, 681 A.2d at 1330. As such, the procedure in this case should mimic that set forth in a competency proceeding. See *Ohio v. Lott,* 779 N.E.2d 1011, 1015 (Ohio 2002) (holding that the trial court should conduct an *Atkins* hearing in a manner comparable to ruling on competency; *i.e.* defendant must prove incompetency to the court by a preponderance of the evidence).

## *Defining Mental Retardation*

*Atkins* provides the following guidance on the issue of defining who qualifies as mentally retarded:

"To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in deter-

mining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright,* with regard to insanity, 'we leave to the states the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.' 477 U.S. 399, 405, 416-17, 91 L.Ed.2d 335, 106 S.Ct. 2595 (1986). n.22

"n.22 The statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n.3, *supra." Atkins* at 317.

Note 3, as referred to in note 22 above, provides the following clinical definitions of mental retardation:

"n.3 The American Association of Mental Retardation (AAMR) defines mental retardation as follows: *'Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

"The American Psychiatric Association's definition is similar: 'The essential feature of mental retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home liv-

ing, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.' American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders [DSM-IV] 41 (4th ed. 2000). 'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43." *Atkins* at 309 n.3.

The court later elaborated on these definitions, as follows:

"As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . ." *Atkins* at 318. (footnotes omitted)

This court finds that the proper definition to apply in this case is that set forth by the AAMR, the principal professional organization in the field of mental retardation research. The AAMR, founded in 1876, has propounded and refined the definition of mental retardation

since 1921 and its definitions have been the most widely accepted by courts, legislatures, and other professional organizations.[6] Ellis, "Mental Retardation and the Death Penalty: A Guide to State Legislative Issues," 27 Mental & Physical Disability Law Reporter (ABA) §III p. 5 (2003) [available at http://www.aamr.org/Reading_Room/pdf/state_legislatures_guide.pdf (last visited June 28, 2003)]; Dowling, "Post-*Atkins* Problems with Enforcing the Supreme Court's Ban on Executing the Mentally Retarded," 33 Seton Hall L. Rev. 773, 793-94 (2003). Furthermore, amongst the states that had adopted statues outlawing the execution of the mentally retarded, at the time of the *Atkins* decision, all had adopted, almost without variation, the AAMR definition. Ellis (2003), *supra* at 5. As such, the consensus in defining mental retardation at the time of the *Atkins* decision was one using the AAMR's definition.[7]

We note that the petitioner has argued this court should apply the definition of mental retardation set forth in Pennsylvania's Mental Health and Mental Retardation Act of 1966, 50 P.S. §4101 et seq.:

" 'Mental retardation' means subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of

---

6. Prior to 1987, the AAMR referred to itself as the American Association on Mental Deficiency (AAMD). For the sake of clarity, all references to the organization prior to 1987 will use the current name.

7. Most states which passed statutes outlawing execution of the mentally retarded based their definitions on the AAMR's 1983 version (8th ed.). The remainder of states based their definitions on the AAMR's 1992 version (9th ed. Ellis (2003)), *supra* at 7. Both definitions are discussed *infra*.

one or more of the following: (1) maturation, (2) learning and (3) social adjustment." 50 P.S. §4102.

This definition of mental retardation is the only one appearing in a Pennsylvania statute.[8] Nevertheless, we reject using this language because it is aimed at defining the mentally retarded in the context of providing them services under the MH/MR Act. It is overly broad for the purpose of defining the mentally retarded in the context of a capital murder case; specifically, by requiring only "subaverage general intellectual functioning" under the first criteria. Nationally-recognized definitions of mental retardation require "significantly subaverage intellectual functioning." As set forth below in greater detail, subaverage general intellectual functioning generally refers to individuals with an IQ of 85 or lower while significantly subaverage general intellectual functioning generally refers to individuals with an IQ of 70 or lower. While Pennsylvania could choose to extend the constitutional protection to a broader range of persons by opting to confer mental retardation status upon persons with mere subaverage intellectual functioning, it is highly doubtful it will so choose.[9]

_____

8. We do note that in the context of determining eligibility for a driver's license, the relevant Medical Advisory Board, appointed by the Department of Transportation, is directed to define mental and physical disabilities as set forth in the Pennsylvania Code, which recognizes the AAMR and DSM classifications of the mentally retarded (discussed *infra*). See *Crosby v. Sultz,* 405 Pa. Super. 527, 541-42, 592 A.2d 1337, 1340-41 (1991) (citing 75 Pa.C.S. §1518(a) and 67 Pa.Code §83.5(a)(6)).

9. For example, both bills currently pending in the General Assembly require "significantly subaverage intellectual functioning." See footnote 3. Senate Bill 26 mimics the AAMR's 1992 definition: "an

## *AAMR Definition*

It is important to note that petitioner was evaluated and classified as mentally retarded on many occasions, beginning in 1973, when he was 6 years old, through his 1997 PCRA hearing, detailed *infra*. During that time span, the AAMR's definition of mental retardation underwent a few revisions.

In 1973, the AAMR defined mental retardation as "significantly subaverage general intellectual functioning which originates during the developmental periods and is associated with impairment in adaptive behavior." American Association on Mental Deficiency, *Manual on Terminology and Classification in Mental Retardation* at 5 (7th ed. 1973). In 1983, the AAMR revised the definition to "significantly subaverage general intellectual

---

individual who has significantly subaverage intellectual functioning as evidenced by an intelligence quotient of 70 or below on an individually administered intelligence quotient test and significant impairment in adaptive behavior, and that the mental retardation is manifested before the individual attains 18 years of age." The House version requires: (1) that the defendant's full-scale IQ be 70 or lower (accounting for all potential margin of error), (2) that the defendant's ability to function is significantly impaired in a manner that is reflected in the facts of the case such that the defendant either was unable to appreciate the criminality of the conduct or, if able to appreciate it, was unable to conform the conduct to legal requirements, (3) that the defendant's impairments are primarily attributable to a diagnosis of mental retardation present from early in childhood development and revealed by contemporaneous written records from early childhood, unless the defendant was deprived of schooling or other social service contacts in which such contemporaneous records would have been created. A cursory view of the House version indicates it may be constitutionally infirm under *Atkins* since it would be possible that its definition would not include persons falling "within the range of mentally retarded offenders about whom there is a national consensus."

functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." American Association on Mental Deficiency, *Classification in Mental Retardation* 11 (8th ed. 1983).

Both the 1973 and 1983 AAMR definitions divided mental retardation into the following subcategories, directly linked with the intellectual functioning criterion as measured by IQ: individuals with IQ scores between 50-55 and 70 were classified with "mild" retardation; those with scores between 35-40 and 50-55 had "moderate" retardation; those with scores between 20-25 and 35-40 were "severely" retarded; and those with scores below 20 or 25 were "profoundly" retarded. *Penry v. Lynaugh* at 308 n.1 (1989) (citing Ellis & Luckasson, "Mentally Retarded Criminal Defendants," 53 Geo. Wash. L. Rev. 414, 423 (1985)). Prior to 1973, the AAMR had defined mental retardation to include all persons with IQ scores more than one standard deviation from the mean; *i.e.,* with an IQ of approximately 85 or lower. Persons whose IQ scores fell in the range of 70-85 had been labeled "borderline retarded." That category was dropped in the 1973 AAMR definition. See Ellis & Luckasson, *supra* (citing AAMR 7th (1973)).

In 1992, the AAMR revised the definition, refining the adaptive behavior component: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental

retardation manifests before age 18." American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992). The 1992 AAMR definition is the one cited by the Supreme Court in *Atkins. Id.* at 309 n.3. The 1992 version eliminated the mild, moderate, severe and profound subcategories of mental retardation. In their place, the new scheme focused on the differences in the level of support needed by a mentally retarded individual, classifying the individual's need in a particular skill area as "intermittent," "limited," "extensive," or "pervasive." Ellis, "Decisions By and For People with Mental Retardation," 37 Vill. L. Rev. 1779, 1784 n.10 (1992).

The most current definition of mental retardation was propounded by the AAMR in 2002 and focuses primarily on refining the adaptive skills component: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002).

Although these definitions reveal some variation over the time period relevant to this case, the mental retardation definitions have maintained the same three core components:

"The common elements of the AAMR definitions address the three components of the concept of mental retardation: (1) substantial intellectual impairment; (2) impact of that impairment on everyday life of the individual; and (3) appearance of the disability at birth or

during the person's childhood. Unless an individual meets all three requirements, he does not fall within the definition of mental retardation. The variations found in the [three most recent] formulations of the AAMR definition differ only in the wording of how they describe the second component, *i.e.* the impact on the individual's life. But it is important to emphasize that the various formulations *describe the same group of individuals,* and therefore do not differ in scope in any significant way." Ellis (2003), *supra* at 5. (emphasis in original)

Thus, a mental retardation diagnosis requires that the person suffer from very substantial impairments in their intellectual and adaptive abilities compared to non-retarded individuals, and that the impairments appear prior to adulthood.

The first criterion, under the AAMR definitions, substantial intellectual impairment (*i.e.* significant limitations in intellectual functioning or significantly sub-average intellectual functioning) occurs where the individual scores two standard deviations or more below the statistical mean on a standardized IQ test, or approximately 70 or below. However, IQ must be considered in light of its standard error of measurement, which for most IQ tests is approximately 5. Thus, the ceiling for the IQ criterion may go up to 75. AAMR 10th (2002) (available at http://www.aamr.org/Policies/faq_mental_ retardation.shtml (last visited June 29, 2003)); Ellis (2003), *supra* at 6-7; Dowling, *supra* at 794. "It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins* at 309 n.5.

The second criterion concerns deficits in adaptive behavior. Adaptive behavior is currently defined by the AAMR as "the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives." AAMR 10th (2002), *supra.* "The adaptive behavior component requires that the intellectual impairment have produced real-world disabling effects on the individual's life. The purpose of this element is to ensure that the individual is not merely a poor test-taker, but rather is a truly disabled individual." Ellis (2003), *supra* at 7.

Finally, the last criterion requires that mental retardation appear during the person's developmental period, currently defined as prior to age 18.

The other major professional organization which has historically defined mental retardation is the American Psychiatric Association, in its Diagnostic and Statistical Manual of Mental Disorders (DSM). The DSM, under its various editions,[10] is considered the authoritative text used by psychologists and psychiatrists for the discussion and diagnosis of mental disorders. Commonwealth vol. 1, exhibit D (Davis dep.), p. 17; Dowling, *supra* at 795; *Heck Van Tran v. Tennessee,* 66 S.W.3d 790, 795 n.4 (Tenn. 2001). As such, its definitions are particularly relevant to this case. Furthermore, the mental health experts who testified in petitioner's earlier proceedings, detailed *infra,* utilized the DSM. Significantly, the DSM's definitions of mental retardation have essentially mir-

---

10. First published in 1952, the DSM has been updated five times: in 1968 (DSM-II), 1980 (DSM-III), 1987 (DSM-III-R), 1994 (DSM-IV) and 2000 (DSM-IV-TR).

rored those of the AAMR and it has historically revised its mental retardation definition to follow changes made by the AAMR.[11] Dowling, *supra* at 806 n.298. One notable difference between the DSM and AAMR, relevant to this case, is that after the AAMR eliminated the mild, moderate, severe and profound subcategories of mental retardation in 1992, the DSM did not follow suit in its subsequent editions (DSM-IV and DSM-IV-TR). Nevertheless, the DSM has maintained, over the time period relevant to this case, definitions of mental retardation which have left unaltered the three core components: (1) substantial intellectual impairment; (2) impact of that impairment on everyday life of the individual (*i.e.,* substantial deficits in adaptive functioning); and (3) appearance of the disability prior to age 18.

### Evidence of Petitioner's Mental Retardation

The issue of petitioner's mental capacity was explored in earlier proceedings, most notably at his 1993 capital sentencing trial and 1997 PCRA hearing. While neither proceeding specifically litigated the question of whether petitioner was mentally retarded, the extensive evidence provided in those proceedings established petitioner's mental retardation for the purpose of this proceeding, including testimony in the latter proceeding wherein the

---

11. For example, the mental retardation definition contained in the 1987 DSM-III-R was adopted from the 1983 AAMR definition. Robert L. Hayman, Jr., "Law, Politics, and The Mentally Retarded Parent" 103 Harv. L. Rev. 1202, 1203 n.2 (1990). Similarly, the mental retardation definitions contained in the 1994 DSM-IV and 2000 DSM-IV-TR respectively, closely follow the 1992 AAMR definition. Ellis (2003), *supra* at 6 n.16; *Atkins* at 309 n.3 (acknowledging similarity between 1992 AAMR (9th ed.) and DSM-IV).

Commonwealth's expert psychologist conceded petitioner's mental retardation.

With regard to the capital sentencing hearing, evidence was provided in order for the jury to determine whether any of two mental/psychologically-based mitigating circumstances applied in his case; specifically, whether he had been under the influence of extreme mental or emotional disturbance and whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. As noted, the jury did not find that these circumstances applied, although they did find, inter alia, that petitioner's "low mental intelligence" was a mitigating factor.

At the 1997 PCRA proceeding, the main issue presented by petitioner was that his sentencing counsel had been ineffective for failing to present evidence at his 1993 sentencing trial of his organic brain disorder (*i.e.,* brain damage). Extensive expert evidence of the existence of this disorder was presented at the PCRA hearing. The mental health experts' testimony revealed a consensus that petitioner suffered from an organic brain disorder and as such, both of the mental/psychologically-based mitigating circumstances, listed above, applied to his case. The experts also agreed that evidence of organicity had been available to petitioner's two sentencing hearing experts and that their testimony, that there existed only a suggestion petitioner's deficits were organically or neurologically based, had been wrong.[12]

---

12. Petitioner had argued that evidence of organic brain damage would have totally changed the evidentiary picture at the capital sen-

The documentary evidence from these proceedings provided the following information regarding petitioner's mental capacity and history: Petitioner was born September 2, 1964 and attended regular kindergarten at Steelton Elementary School but was thereafter placed in special education classes beginning in first grade for the "educable" mentally retarded.[13] Petitioner exhibit 1, tab 6. He was placed in several detention homes by the age of 9 due to stealing, running away and physical assault. He began to commit serious delinquent acts around the age of 10 including burglary, arson and threatening another person with a revolver. *Id.* (Guidance Assoc. eval. Aug. 1978.) He was removed from public school in fourth grade and was thereafter placed in 10 or 11 homes and facilities through the age 17. He attended school sporadically and was expelled from almost every treatment facility into which he was placed. *Id.* (Bleiman and Zurick evals.); Commonwealth vol. I, exhibit A (sent. hearing), pp. 75-76; Commonwealth vol. I, exhibit C (Schneider dep.), pp. 14-15.

In 1971, when petitioner was 6 or 7 years of age, he was evaluated with an IQ of 66. Petitioner exhibit 1, tab 6 (ESSH Bleiman eval.). In 1974, at 9 1/2 years of age, petitioner was evaluated with a full scale IQ of 67 and noted to be "within the normal range for a child with mild mental retardation." *Id.* (CAIU eval.) A 1975 psy-

---

tencing proceeding by significantly weakening the aggravating factors. Ultimately, however, petitioner was not entitled to relief since his experts' failure to present organicity evidence in 1993 was not a cognizable PCRA claim.

13. Mild mental retardation "is roughly equivalent to what used to be referred to as the educational category of 'educable.' " DSM-IV-TR §317.

chological evaluation, when he was 10 1/2, found his full scale IQ of 55 and stated "he is to be considered seriously disturbed, retarded and extremely hyperactive." *Id.* (Peck eval.) In 1976, at approximately 12 years of age, petitioner was tested with a full scale IQ of 59, placing in the educable retarded area on some scores and in the seriously regressed or retarded area in others. *Id.* (Youth Dev. Center eval.) By age 12 1/2, petitioner was measured with a full scale IQ of 55. *Id.* (ESSH Paul eval.) In 1978, at 13 years, 11 months, petitioner was measured with an IQ of 72 and classified as "borderline." *Id.* (Guidance Assoc. eval. Aug. 1978.) At some point between July 1980 and March 1981, petitioner obtained an IQ of 78. Commonwealth vol. II (Weaversville eval.). In June 1981, at 16 years, 9 months, petitioner was measured with an 81 IQ. Commonwealth vol. II (Guidance Assoc. eval. June 1981.) In 1986, at 21 years of age, petitioner was measured with an IQ of 71 and was described as functioning within the "borderline retarded range of intelligence." Petitioner exhibit 1, tab 6 (Zurick eval.).

In addition to this documentary evidence, all five mental health experts (three psychologists and two psychiatrists) who evaluated petitioner in connection with his 1993 sentencing trial and/or 1997 PCRA hearing, concluded he was mentally retarded, including, most notably, the Commonwealth's expert Dr. Dixon Miller. Significantly, Dr. Miller testified that there existed in the record "uncontestable" evidence of petitioner's mental retardation and that petitioner *"has currently and has throughout his life functioned in the mentally retarded range of abilities."* See *infra.*

At the 1993 capital sentencing, Stanley Schneider, a clinical psychologist, diagnosed petitioner as mentally retarded.[14] He stated at that time that *"he is retarded,"* and placed petitioner in either the mild or borderline category, noting his IQ scores ranged from the mid-60s to low 70s. Petitioner exhibit 1, tab 1, pp. 67, 70. Dr. Schneider clarified his diagnosis in a 1997 deposition, given for the purpose of the PCRA proceeding:

"A: . . . the diagnosis regarding retardation varied over time depending upon the test and when it was given and how much he recalls from prior [tests] because these tests are basically the same. So there is a practice effect. . . . *He is retarded, that has never been an issue."* Commonwealth vol. I, exhibit C, p. 47. (emphasis added) Dr. Schneider indicated in his 1997 deposition that he made his 1993 diagnoses under DSM-III and DSM-III-R. Commonwealth vol. I, exhibit C, pp. 53-54.

Robert Davis, a forensic psychiatrist, also testified on petitioner's behalf at his 1993 sentencing, finding that *"he is mentally retarded"* and categorizing petitioner in the borderline range, noting his IQ as 71.[15] Petitioner's exhibit 1, tab 1, p. 139. Dr. Davis based his diagnosis under DSM-III-R. *Id.* at 160. In his 1997 deposition, Dr. Davis was asked whether the fact that petitioner was organically brain damaged was something different from testimony he had provided in 1993. In response, he stated:

---

14. The Commonwealth did not offer any testimony at the capital sentencing trial.

15. Dr. Davis apparently used the IQ result taken of petitioner from 1986 when he was approximately 21 years old. See Commonwealth vol. II, Dr. Davis psychiatric eval. October 11, 1990.

"A: . . . *We did say he was mentally retarded* [in 1993] and had suffered from minimum brain dysfunction. If you take people who are mentally retarded, by definition, they have suffered some type of assault to their brain at some point in development before age 18." Commonwealth vol. I, exhibit D, p. 16 (emphasis added); see also, pp. 47-49, 66-69.

Additionally, all three experts who testified at the 1997 PCRA hearing classified petitioner as mentally retarded. Carol Armstrong, a psychologist with a neuropsychology subspecialty, conducted a comprehensive neuropsychological evaluation of petitioner in 1996 when petitioner was 31 years old, including full scale IQ testing. Petitioner's IQ result was 76, which put him in the borderline mentally retarded range. Petitioner exhibit 1, tab 8, p. 28. However, Dr. Armstrong noted in her 1996 report that "strong practice effects appear likely because of repeated testing" and that petitioner had an "implicit recall of test procedures." *Id.* at tab 7. She later testified at the 1997 hearing that the 76 IQ score "was probably an overestimate in that it was the eighth or ninth time that he had been administered that battery," noting the general trend of improved IQ scores from his early childhood through adolescence. *Id.* at tab 8, pp. 48-49. She testified that *"he would qualify as retarded,"* in light of his IQ score and "other severe deficits compromising his functional abilities." *Id.* at pp. 49-50.

Robert Fox, a forensic psychiatrist, also testified on petitioner's behalf at the 1997 PCRA hearing. Dr. Fox similarly diagnosed petitioner with *"mild mental retardation"* under the then current DSM-III-R, noting that mild retardation is so diagnosed where IQ falls between

50 and 70. Petitioner exhibit 1, tab 9, p. 142. He discounted the higher, later IQ tests as attributable to practice effect. *Id.* at 143.

Of the greatest significance to this court, however, was the testimony of psychologist Dr. Miller, also a subspecialist in clinical neuropsychology, who testified on the Commonwealth's behalf at the PCRA hearing. The thrust of the questioning aimed at Dr. Miller concerned the issue of petitioner's organic brain disease and whether such evidence had been available to petitioner's two experts (Drs. Schneider and Davis) at the time of his 1993 capital sentencing trial. During the course of this testimony, Dr. Miller was asked to comment upon Dr. Armstrong's neuropsychological evaluation:

"Q: Now specifically with regard to the first line [of Dr. Armstrong's report] there that he is broadly impaired across all neurocognitive domains, was there anything specifically about that in reviewing the summation that you found peculiar regarding that as a neuropsychologist?

"A: Well, only that it is consistent with what has been known from the history that has already indicated that *this gentleman is functioning at the mentally retarded or borderline retarded range.*" *Id.* at tab 10, p. 209. (emphasis added)

"Q: Well is [Dr. Armstrong's report] something new? Is this something we haven't seen in the prior testimony?

"A: It's new in terms of specificity I think but if the issue here is does this individual have some type of organic brain damage, I think that aspect is redundant of things that have been tested. *In saying that he has cur-*

*rently and has throughout his life functioned in the mentally retarded range of abilities, that already tells us something about the integrity of the brain or lack of integrity of brain function." Id.* at 217-18. (emphasis added)

"Q: Was the jury told that [petitioner suffers from organic impairment across a wide variety of functions] in the last trial?

"A: I believe there were a number of references to that. As I mentioned earlier when you say that he doesn't because of his learning disability, his attention deficit disorder, *or his mental retardation,* he doesn't think or reason like you and I would. *I believe [the jury was] told that sort of thing in the previous trial from the testimony I reviewed." Id.* at 222. (emphasis added)

Dr. Miller was later asked a series of questions whether, at the 1993 sentencing, there existed more than just a suggestion petitioner was brain damaged:

"Q: *So there already was essentially* uncontestable *evidence in the record of brain damage?*

"A: *Well of mental retardation* which as I stated is a form of brain dysfunction . . . ." *Id.* at 223-24. (emphasis added)

With regard to the chronicity of petitioner's impairments, Dr. Miller testified as follows:

"Q: . . . There is nothing in the [sentencing hearing] testimony that talks about the chronic nature of his deficits?

"A: *Well mental retardation again by definition is a chronic condition. I don't know again that that is, anybody said, hey, he is mentally retarded, he has been and he always will be." Id.* at 227. (emphasis added)

Finally, Dr. Miller was asked about the nature of petitioner's limitations, as follows:

"Q: Doctor, with regard to this evidence of mental disturbance and his inability to substantially conform his conduct, can we classify that as either a decrease in his mental intelligence or as some type of mental illness? Can we classify it into either of those two realms?

"A: I think the effective, what is written about here and testified to by Dr. Armstrong, she herself said the basis as she determined it in his organic dysfunction is his mental retardation. *I believe the mental retardation was testified to [at the sentencing hearing] and that in itself does represent certainly some limitation in an individual's capacity to understand information and to reach conclusions. Whether [mental retardation] creates for him an inability as opposed to a limitation, that is a judgment call.*" *Id.* at 233. (emphasis added) Dr. Miller based his conclusions on the DSM-III and -IV. *Id.* at 216.

This evidence, in combination with the documentary evidence provided this court, proved by a preponderance of evidence that petitioner is mentally retarded. All five experts, including the Commonwealth's expert witness Dr. Miller, definitively stated that petitioner was and is mentally retarded. Dr. Miller, as well as Drs. Schneider, Davis and Armstrong alternately described petitioner as either borderline or mildly mentally retarded. Classification into one or the other category depends upon whether petitioner's IQ falls below or above 70. For the purpose of this proceeding, the distinction is important since persons with borderline mental retardation might

not be considered mentally retarded under the *Atkins* criteria.[16]

As noted, whether a person falls into any of the subcategories of mental retardation (under the DSM) depends solely upon the intellectual functioning criterion of the mentally retarded definition, which is essentially measured by standardized IQ tests. Thus, the descriptions given by Drs. Miller, Schneider, Davis and Armstrong, suggesting petitioner to be either mildly or borderline mentally retarded, depended upon which IQ test(s) they accepted. While petitioner's IQ scores varied widely, the evidence provided this court established by a preponderance of the evidence that his IQ qualifies as between 70 and 75, or below, placing him in the mild mental retardation range.[17]

---

16. As set forth above, borderline mental retardation had been traditionally used to diagnose the mentally retarded whose IQs fell between 70 and 85. As noted, the AAMR stopped using this category in 1973, and also dispensed with the mild mental retardation subcategory in 1992. Nevertheless, the experts who testified in 1993 and 1997 continued to use this term, indicating their continued adherence to the DSM terminology.

17. About 85 percent of all those diagnosed with mental retardation fall into this category. DSM-IV-TR at 41. The term "mild" mental retardation can be misleading, for even the highest functioning individuals with mental retardation must have substantial cognitive and behavioral disabilities before they can be diagnosed with retardation. AAMR 9th at 5; DSM-IV-TR, *supra.* Each subcategory (mild, moderate, etc.) "is by definition marked by significant and serious impairments to intelligence and adaptive functioning." *Heck Van Tran v. Tennessee* at 796. "Although there is great variation in the level of functioning of people within the classification of mental retardation, the highest functioning individuals in the class have a substantial disability." *United States v. Cockrell,* 1997 U.S. Dist. Lexis 23467 (M.D.Ala. 1997) (citing Ellis (1992), *supra* at 1784).

As set forth above, petitioner underwent at least nine IQ tests prior to his 22nd birthday. All but two of his scores (a 78 and 81) fell within the five point margin of error for a qualifying ceiling IQ of 75. Most significantly, the first five times petitioner was tested, his scores—66, 67, 55, 59 and 55—were all below 70, including three scores well below the threshold IQ factoring in the margin of error. Furthermore, his two highest scores, a 78 and 81, respectively, were achieved on his seventh and eighth tests, and the latter score resulted from a test taken within a year of his previous test. This reflects the theory testified to by Drs. Schneider, Armstrong and Fox, that a "practice effect" enhanced petitioner's IQ scores as he underwent subsequent testing.[18] Commonwealth vol. I, exhibit C, p. 47; petitioner exhibit 1, tab 7, tab 8, pp. 48-49, and tab 9, p. 143. See *Brackett v. Apfel,* 1998 U.S. Dist. Lexis 9616, \*22 (S.D. Ala. 1998) (citation omitted) (acknowledging that higher scores on subsequent IQ tests are "likely attributable to the well-documented 'practice effect' ").

Thus, although the experts suggested petitioner's mental retardation fell into the borderline range, this would not disqualify petitioner from being considered mentally retarded for the purposes of this proceeding, inasmuch as that categorization of "borderline" was solely based upon practice-effect enhanced IQ scores greater than 70.

---

18. Furthermore, there can be no dispute but that there exists no hint of feigning or malingering on these tests given that the bulk of them were administered when petitioner was between 6 and 14 years of age. See Ellis (2003), *supra,* section III p. 9 (there are no reports in the clinical literature indicating that malingering or feigning is a practical problem in the assessment of individuals who are thought to have mental retardation).

As set forth above, however, the preponderance of the evidence proved petitioner scored below this threshold after the practice effect was considered. Nevertheless, the experts were otherwise unanimous in classifying petitioner as "mentally retarded." ("He is retarded, that has never been an issue" (Dr. Schneider); "he is mentally retarded" (Dr. Davis); "he would qualify as retarded" (Dr. Armstrong); petitioner has "mild mental retardation" (Dr. Fox); and petitioner "has throughout his life functioned in the mentally retarded range of abilities" (Dr. Miller), *supra.*) These conclusions necessarily include findings, not only of lowered IQ, but also deficits in adaptive functioning and early onset, as those are necessary elements for a clinical diagnosis of mental retardation, whether under the AAMR definition or that of included in the DSM, and whether under an earlier or later version of those definitions, *supra.* See *e.g.,* Commonwealth vol. I, exhibit C, p. 21 (Dr. Schneider acknowledges that by definition, mental retardation includes not only a lowered IQ "but deficits in adaptive behavior"); Petitioner exhibit 1, tab 8, pp. 49-50 (Dr. Armstrong noted that her finding of mental retardation was based on IQ score "and other severe deficits compromising his functional abilities"); Commonwealth vol. I, exhibit D, p. 16 (Dr. Miller testified that mental retardation, by definition, occurs "at some point in development before age 18").

Finally, we note that the Commonwealth petitioned this court to appoint or permit another expert to evaluate petitioner's "mental retardation," and requesting a hearing under the *Atkins* case. This court's order, vacating petitioner's death sentences under *Atkins,* essentially denied that request on the basis that the record, from the

1993 and 1997 proceedings, already contained an abundance of evidence on the mental retardation issue. An additional evaluation of petitioner would not have provided any relevant information on his mental capacity as of the time of his criminal acts or trials, especially considering the "practice effect" of repeated IQ testing, and especially since the Commonwealth had already presented an expert who had previously testified to the issue of mental retardation.

Accordingly, I entered an order December 17, 2002, vacating petitioner's death sentences and imposing consecutive life sentences upon him.